UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAMIEN JONES AS PUTATIVE ADMINISTRATOR OF THE ESTATE OF WILLIAM BROWN, | Case No. _____ |
| Plaintiff, | **COMPLAINT AND JURY DEMAND** |
| -against- | |
| THE CITY OF NEW YORK, CORRECTION OFFICER NIKITA HERCULES, *and* CORRECTION OFFICER IRWIN DE LEON, | |
| Defendants. | |

Plaintiff DAMIEN JONES as Putative Administrator of the Estate of WILLIAM

BROWN, by and through his attorneys, Emery Celli Brinckerhoff Abady Ward & Maazel LLP,

for his Complaint, alleges as follows:

1.      This is a civil rights action brought on behalf of the estate of William Brown, who

died while he was a prisoner on Rikers Island on December 14, 2021. Correction officers stood

by and watched as he lay dying in front of them on the floor of the jail. Mr. Brown was 55 years

old.

2.      Mr. Brown arrived at Rikers Island in November 2021. A month later, on the

evening of December 14, 2021, Mr. Brown and other incarcerated individuals congregated in the

dayroom in their housing unit in the Anna M. Kross Center ("AMKC") jail at Rikers Island.

3.      That evening, Defendant Officer Nikita Hercules, the "B post officer," who

should have been on post supervising the incarcerated individuals in her care and custody,

inexplicably left her post for three and a half hours. The other correction officer on duty,

Defendant Officer Irwin De Leon, the "A post officer," ignored that incarcerated individuals

were improperly gathering at night, smoking in plain view of his station. He did nothing to respond to what ultimately became a medical emergency for several individuals.

4.    As a result of the total lack of supervision in their unit, Mr. Brown and others were able to congregate on the evening of his death in the AMKC dayroom—which should not have been accessible to them at the time—and smoke.

5.    After sharing a makeshift cigarette, Mr. Brown and at least two other incarcerated individuals fell ill immediately.

6.    Mr. Brown slumped over in his chair and fell to the floor, as others around him began vomiting and falling to the ground as well.

7.    At 10:32 pm, minutes after this commotion began, Defendant Officer Hercules returned to her post.

8.    Defendant Officer Hercules stood outside the dayroom, with her hands in her pockets and observing through the window, as Mr. Brown lay unresponsive on the floor. Other incarcerated individuals attempted to aid Mr. Brown, and others who become ill. But Defendant Officer Hercules stood there, ***doing nothing***, for ***five full minutes*** before finally walking to the A Post officer's station to activate a medical emergency, as captured on surveillance footage. After doing so, she went back to the dayroom and stood observing, still doing nothing, for another four minutes.

9.    Defendant Officer Irwin De Leon, the A post officer at the time, whose station had a full view of the emergency unfolding in the dayroom, did nothing to assist Mr. Brown or any of the individuals lying unresponsive, vomiting, or otherwise in obvious distress until Defendant Officer Hercules told him to activate a medical emergency.

10.    Ten full minutes after she first observed him lying unresponsive on the floor, Defendant Officer Hercules started chest compressions on Mr. Brown. She gave up after less than a minute.

11.    When medical staff arrived, they attempted to provide emergency assistance, but it was too late. Mr. Brown was pronounced dead that evening.

12.    Mr. Brown's death is a tragic, almost textbook example of individual correction officers acting with deliberate indifference to a prisoner's serious medical needs and causing his death. But it is also the direct result of the City of New York's widespread and persistent policies, customs, and practices of deficient supervision of individuals in its care on Rikers Island, of failing to adequately provide emergency first aid to incarcerated people, and of failing to provide routine medical and mental health care.

13.    Mr. Brown's suffering and death were preventable and needless. Defendants' actions were contrary to law, contrary to sound correctional practice, and contrary to any measure of human decency. By this Complaint, Mr. Brown's estate seeks to hold the Defendants accountable for their violations of Mr. Brown's constitutional rights and for his death.

## PARTIES

14.    Plaintiff is Damien Jones, brother of the deceased, William Brown. Mr. Jones has duly applied to the Kings County Surrogate's Court to be appointed the administrator of the estate of William Brown for the purpose of bringing this action. Mr. Jones filed a petition for appointment as administrator of Mr. Brown's estate with the King's County Surrogate's Court on December 2, 2024.

15.    William Brown was a resident of the state of New York and resided at Rikers Island Jail in Bronx County at the time these events occurred.

16.     Defendant the City of New York ("the City") is a municipal corporation that, through the Department of Correction ("DOC"), operates a number of jails on Rikers Island, including the Anna M. Kross Center. DOC is responsible for the provision of medical care and services to prisoners confined in the City jails, including the jails in which Mr. Brown was confined between November 14, 2021 and December 14, 2021.

17.     DOC, through its senior officials at the central office and in each jail facility, promulgates and implements policies, including those with respect to the provision of healthcare and emergency services and access to medical and other program services mandated by local law and court orders. In addition, senior officials at DOC are aware of and tolerate certain practices by subordinate employees in the jails, including those that are inconsistent with formal policy. Because they are widespread, longstanding, and deeply embedded in the culture of the agency, these practices constitute unwritten DOC policies, customs, or practices. DOC is also responsible for the appointment, training, supervision, and conduct of all DOC personnel, including the individual Defendants referenced herein.

18.     At all times relevant, Correction Officer Nikita Hercules was employed by the DOC and assigned to the AMKC.

19.     At all times relevant, Correction Officer Irwin De Leon was employed by the DOC and assigned to the AMKC.

20.     At all relevant times, Defendants Officers Hercules and De Leon (the "Individual Officer Defendants") were officers of the DOC, who participated in and/or had knowledge of and failed to intervene in the denial of timely medical care to Mr. Brown on December 14, 2021. At all times relevant, the Individual Officer Defendants were acting under color of state law and

within the scope of their capacities as agents, servants, and employees of Defendant City. The

Individual Officer Defendants are sued in their individual capacities.

## JURISDICTION AND VENUE

21.    This action arises under the Fourteenth Amendment to the United States

Constitution, 42 U.S.C. § 1983.

22.    This Court has subject matter jurisdiction over Plaintiff's federal law claims

pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4), because Plaintiff's claims arise under the laws

of the United States, namely 42 U.S.C. § 1983, and seek redress of the deprivation, under color

of state law, of rights guaranteed by the Constitution of the United States.

23.    Venue lies in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant City

of New York resides in this judicial district and the acts complained of occurred in this judicial

district.

## JURY DEMAND

24.    Plaintiff demands a trial by jury in this action.

## STATEMENT OF FACTS

25.    William Brown grew up in Brooklyn, New York.

26.    As an adult, Mr. Brown struggled with addiction and mental illness. He was

incarcerated multiple times by the New York City Department of Correction and the New York

State Department of Corrections and Community Supervision.

27.    Mr. Brown sought out addiction treatment and had successfully completed a

treatment program several years ago.

*William Brown Arrives at Rikers Island*

28.    On November 14, 2021, William Brown was arrested for robbery, criminal possession of a controlled substance, and petit larceny. He was sent to Rikers Island that same day.

29.    Mr. Brown was detained in the custody, care, and control of the DOC at Rikers Island for 30 days until his death in custody on December 14, 2021.

30.    When he was first taken to Rikers Island, Mr. Brown was housed in the Communicable Disease Unit ("CDU") at West Facility for two weeks.

31.    On his first day in custody, November 14, Mr. Brown underwent a mental health review, where clinical staff noted that he had "schizoaffective disorder."

32.    A person with schizoaffective disorder may experience psychotic symptoms.

33.    Mr. Brown reported he was taking Haloperidol, an antipsychotic medication.

34.    Mr. Brown was not seen for a mental health evaluation for 12 days after his arrival at Rikers Island.

35.    Mr. Brown's medical appointments were repeatedly canceled.

36.    Three medical appointments were canceled by Correctional Health Services ("CHS"). In two instances, the cancellation was due to insufficient staffing levels in the facility and resultant safety concerns.

37.    Seven appointments were canceled because Mr. Brown was not produced by DOC staff for his appointment.

38.    As a result, Mr. Brown was not provided with his psychiatric medication until 12 days after he arrived at Rikers Island.

39.    On November 28, 2021, he was transferred to AMKC.

***December 14, 2021 – Officer Defendants Fail to Adequately Supervise Mr. Brown's Housing Unit***

40.     In the hours before his death on the night of December 14, 2021, Mr. Brown was socializing with other incarcerated people in his housing unit at AMKC.

41.     Between 5:18 PM and 7:00 PM, Mr. Brown circulated between the dorm and the dayroom, eating a meal and sitting with other incarcerated people.

42.     The officers on duty the night of December 14, 2021 included Defendants Officers Hercules and De Leon.

43.     Defendant Officer Hercules was appointed a Corrections Officer on January 8, 2018.

44.     In the less than four-year period between her appointment and Mr. Brown's death, Defendant Officer Hercules accumulated eight instances of command discipline.

45.     Four of these instances of command discipline were for failure to report to her post or failure to report for work at all.

46.     On November 9, 2021, Defendant Officer Hercules was suspended for thirty days pursuant to being absent without leave ("AWOL") on October 23, 2021.

47.     On information and belief, Defendant Officer Hercules returned to work following this suspension just days before Mr. Brown's death on December 14, 2021.

48.     Defendant Officer Hercules came on post shortly before 7:00 PM.  She was assigned to the B post.

49.     Defendant Officer De Leon came on post at around 7:00 PM.  He was assigned to the A post.

50.     At 6:55 PM, Defendant Officer Hercules entered the housing area, but did not go into the dayroom.

51.    At 6:58 PM, Defendant Officer Hercules left the post.

52.    From 7:00 PM to 10:32 PM, Defendant Officer Hercules was not on her post in Mr. Brown's housing unit at AMKC.

53.    DOC policy requires that officers conduct rounds of their housing areas at least every 30 minutes.

54.    Both Defendants Officers De Leon's and Hercules's logbook entries reflect that they toured their assigned areas every thirty minutes between 7:00 and 10:00 PM, with the exception that Defendant Hercules acknowledged in her logbook being off post for a "personal" because she "[wa]sn't feeling well" between 9:00 and 9:30 PM.

55.    Defendant Officer Hercules noted in the logbook that she was actively touring the housing unit between 7:00 and 10:00 PM.

56.    These entries were false; Defendant Officer Hercules made no tours of the unit during those hours.

57.    Between 7:00 and 9:00, Mr. Brown ate a meal sitting on his bed in the dorm and sat with other people incarcerated in the dayroom.

58.    There was no staff on B post at 8:00 PM.

59.    There was no staff on B post at 9:00 PM.

60.    Defendant Officer Hercules's logbook noted she imposed an "institutional lock in" at 9:00 PM.

61.    However, the incarcerated individuals in Mr. Brown's unit were not locked in at 9:00 PM; they were, in fact, still congregating in the dayroom after 9:00 PM.

62.    Between 9:00 and 10:00 PM, Mr. Brown was in the dorm, socializing, and eating.

63.    At 10:03 PM, Mr. Brown walked out of the dayroom. Mr. Brown then stood by the bathroom and returned to the dorm, eating food out of a bowl while sitting on his bed.

64.    At 10:19 PM, more than an hour after Defendant Officer Hercules purported to have imposed an institutional lock-in, Mr. Brown re-entered the dayroom.

65.    Mr. Brown stood in the dayroom near where other incarcerated individuals were sitting on chairs.

66.    At 10:26 PM, Mr. Brown smoked an unknown substance.

67.    The A post station, Defendant Officer De Leon's post, had a clear view of the dayroom where the individuals were congregating and smoking—and any officer stationed there could see that incarcerated individuals were improperly congregating in the dayroom well after the institutional lock-in time.

68.    At no point did Defendant Officer De Leon disperse the group in the dayroom.

69.    At 10:28 PM, Mr. Brown began to slouch over in his chair.



70.    At 10:28, the other incarcerated individuals who had been sitting with Mr. Brown stood up and gather around a different person, who was apparently vomiting.

71.    At 10:29 PM, Mr. Brown fell to the floor.



72.    Other incarcerated individuals surrounded Mr. Brown, attempting to assist him and move him.

73.    Officer De Leon, the A post officer, did nothing to assist Mr. Brown or the other individuals in obvious distress.

74.    At 10:32 PM, Defendant Officer Hercules returned to her post.

75.    Defendant Officer Hercules stood outside the dayroom and looked in through the window at the incarcerated individuals attempting to assist Mr. Brown. Other incarcerated individuals stood near her.

76.    At 10:34 PM, Defendant Officer Hercules still stood outside the dayroom, looking through the window, observing Mr. Brown lying on the floor and other incarcerated individuals attempting to render aid. Defendant Officer Hercules stood with her hands in her pockets.



77.    While she stood there, a third incarcerated individual fell to the ground.

78.    At 10:35 PM, Defendant Officer Hercules still stood outside the dayroom, looking through the window, observing Mr. Brown and others lying on the ground, doing nothing to address the situation.



79.     At 10:36 PM, Defendant Officer Hercules entered the dayroom. She continued to stand with her hands in her pockets, staring at where Mr. Brown and others were lying on the ground, while other incarcerated individuals attempted to render aid.



80.     Defendant Officer Hercules did nothing to assist the individuals experiencing a medical emergency mere feet away from her.

81.     At 10:37 PM, Defendant Officer Hercules entered the A Post officer's station, where Defendant Officer De Leon was stationed.

82.     From his position in the A Post officer's station, Defendant Officer De Leon could see the chaos unfolding in the dayroom, including that several incarcerated individuals, including Mr. Brown, were lying on the floor, and others appeared to be vomiting.

83.     However, up until that time, Defendant Officer De Leon failed to take any action to assist Mr. Brown or the other individuals, although they were visibly sick, in need of medical attention, and experiencing an obvious emergency.

84.     Defendant Officer Hercules told Defendant Officer De Leon to activate a medical emergency.

85.     At 10:38 PM, Defendant Officer Hercules returned to the dayroom. She continued to stand and do nothing while Mr. Brown lay dying on the ground, and while another incarcerated individual began vomiting.

86.     At 10:42 PM, ten minutes after she returned to post and observed Mr. Brown and others lying on the ground, Defendant Officer Hercules finally began to render aid. She began performing chest compressions on Mr. Brown.

87.     At this time, Defendant Officer De Leon entered the dayroom.

88.     However, inexplicably, Defendant Officer Hercules stopped performing chest compressions on Mr. Brown one minute later, at 10:43 PM.

89.     Defendant Officer De Leon did not take over performing chest compressions.

90.     Performing continuous chest compressions without interruption is critical for survival under these circumstances.

91.     Defendant Officer Hercules resumed chest compressions at 10:46 PM.

92.     At 10:49 PM, medical staff arrived in the area and took over rendering CPR to Mr. Brown.

93.     Medical staff continued to perform CPR on Mr. Brown until emergency medical services ("EMS") arrived at 11:15 PM and took over rendering aid.

94.     At 11:46 PM, Mr. Brown was pronounced deceased.

95.    A blanket was placed over Mr. Brown's body at 12:06 AM.



96.    The official cause of Mr. Brown's death as determined by the New York City

Office of Chief Medical Examiner ("OCME") was acute synthetic cannabinoid intoxication.

***The Board of Correction Investigates Mr. Brown's Death***

97.    The New York City Board of Correction ("BOC") is the city agency that

regulates, monitors, and inspects City correctional facilities.

98.    The BOC is required by statute to investigate the circumstances of all in-custody

deaths at City correctional facilities.

99.    The BOC investigated Mr. Brown's death.

100.    As part of its investigation, BOC staff interviewed people in custody and staff and

reviewed video footage, DOC records, and medical records.

101.    On September 12, 2022, the BOC published its Report and Recommendations on

2021 Suicides and Drug-Related Deaths in New York City Department of Correction Custody

("the 2022 BOC Report").

102.    According to the 2022 BOC Report, sixteen people including Mr. Brown died in DOC custody in 2021, including six by suicide, four by acute drug intoxication, and six because of medical complications.

103.    The 2022 BOC Report included the BOC's findings regarding Mr. Brown's in-custody death.

104.    The 2022 BOC Report stated that Defendant Officer Hercules "did not tour either the dormitory or dayroom every 30 minutes, despite making entries in the logbook stating otherwise," and instead "remained seated and mostly stationary at the 'B' Post table," until she left the post at approximately 6:10 PM, and "the post remained empty and there were no correction officers in the housing area until 10:33 PM."

105.    The 2022 BOC Report observed that Defendant Officer Hercules, upon returning to the housing area at 10:33 PM and observing Mr. Brown on the floor, "[i]nstead of rendering aid immediately or calling in an emergency, the correction officer stood by for four minutes, and watched as people in custody shook and patted Mr. Brown, trying to wake him."

106.    The 2022 BOC Report then observed that, after leaving the housing area and returning a minute later, Defendant Officer Hercules "simply stood by until 10:42 PM, when she began performing chest compressions, but she stopped after a minute."

107.    The 2022 BOC Report concluded that "the pervasive issue of insufficient rounding and supervision by correctional staff was present in at least eight of the ten deaths reviewed," and that "in the case of William Brown, a 'B' post remained empty from at least 6:10 PM to 10:33 PM. During this unsupervised period, people in custody smoked, were in the dayroom past 9:00 pm against DOC policy, and ultimately became sick. DOC failed to

adequately maintain the care, custody, and control of these housing areas by not actively supervising those in their custody according to their own policies, leading to tragic results."

108.    The 2022 BOC Report also concluded that "[t]he prevalence of drugs, often laced with fentanyl, combined with deficient supervision and reduced staffing, threatens the lives of those in custody on a daily basis."

109.    The BOC cited the City's own reporting, which noted that "banned drugs were seized within the [City's] jails more than 2,600 times between April 2020 and May 2021, more than double the seizures from April 2018 and May 2019, when the [jail population] was higher."

110.    Consistent with this finding, the BOC noted that Mr. Brown "died and other people in his housing area became sick and vomited after openly smoking a cigarette that now is known to have been a synthetic cannabinoid."

111.    The 2022 BOC Report further concluded that "uniformed staff failed to provide timely first aid, if at all, in at least five of the deaths described above," including where "[t]he correction officer assigned to William Brown's housing area stood by for at least nine minutes while multiple individuals vomited, and Mr. Brown became unresponsive, before performing chest compressions."

112.    The BOC highlighted that Mr. Brown failed to receive any of his psychiatric medication until twelve days after his admission to Rikers Island due to "delays in his mental health evaluation."

113.    The 2022 BOC Report also highlighted Mr. Brown's many missed medical appointments, some canceled by CHS due to "insufficient staffing levels in the facility and due to safety concerns," and others canceled because of DOC staff's failure to produce Mr. Brown.

The BOC recommended "improved coordination" to "avoid undue delays in receiving critical medical care."

***The City's Widespread and Persistent Practice of Insufficient Supervision by Jail Staff***

114.    According to formal DOC policy, correction officers are required to conduct rounds in jail housing units every 30 minutes.

115.    In reality, DOC officers (both at the time of Mr. Brown's death and for years before and since) routinely failed to conduct adequate rounds or otherwise adequately supervise incarcerated people in its custody.

116.    The City had ample notice in the years and months leading up to Mr. Brown's death of the widespread and persistent practice of DOC's failure to adequately supervise the people in its custody. First, the department experienced a massive staffing crisis beginning in the summer of 2021 that was still not resolved by December 2021. Second, at least seven people died in 2021—before Mr. Brown's death—under circumstances where insufficient supervision contributed to their deaths.

117.    During the time period leading up to Mr. Brown's death, the City was aware that DOC's ability to adequately supervise the incarcerated population was dropping precipitously because of widespread failures by DOC staff to report to work. The independent monitor appointed by a judge of this Court to oversee the City's compliance with its Consent Judgment in *Nunez v. City of New York* concerning conditions of confinement at Rikers Island (the "Independent Monitor"), described this as a "staffing crisis" in Summer 2021.

118.    In January 2019, before the COVID-19 pandemic, an average of 6% of employees were out sick on a given day.

119.    By April 2020—over a year before Mr. Brown's death—an average of one third of DOC's workforce—over 3,000 officers—was out sick on a given day.

120.    According to the Independent Monitor's October 18, 2022 Status Report, the City's failure to address staff attendance at DOC facilities "reached an apex in 2021" and caused DOC's jails to be left "without sufficient staff to provide adequate safety and access to services."

121.    In September 2021, an average of 21% of DOC staff were on sick leave on a given day.

122.    By January 2022, one month after Mr. Brown's death, the number had risen to 26%.

123.    DOC had ample notice before Mr. Brown's death of its staffing crisis and its dangerous consequences. In October 2021, a class of incarcerated people filed a petition in New York Supreme Court, Bronx County, *Agnew v. New York City Department of Corrections*, Index No. 813431/2021E, challenging DOC's refusal to provide access to medical services to individuals in custody. This action highlighted that the staffing crisis on Rikers Island was a major driver of the DOC's failure to produce incarcerated individuals for their medical appointments.

124.    Even when DOC staff were physically present, they failed to adequately supervise the incarcerated individuals in their care—failing to monitor the housing areas, remain on post, and implement basic security, including securing doors.

125.    Prior to Mr. Brown's death, the City had ample notice of DOC staff's widespread and persistent practice of failing to adequately monitor or supervise housing areas and care for individuals in their custody—including because, over the course of 2021, people died under

circumstances where staff's failure to adequately supervise the incarcerated population contributed to their deaths.

126.    In 2021 alone, the DOC's widespread and persistent practice of insufficient jail supervision contributed to the deaths of at least seven incarcerated people, not including Mr. Brown.

127.    According to the 2022 BOC report, in each of the following cases, the "DOC failed to adequately maintain the care, custody, and control of [DOC] housing areas by not actively supervising those in their custody according to their own policies, leading to tragic results."

128.    After his medical appointment on March 2, 2021, Thomas Carlo Camacho remained alone in a DOC's Hart Island Clinic pen for seven hours after a mental health appointment. During that time, correction officers did not check on him for several hours. Because of his lack of supervision, Mr. Camacho was able to put his head through the cuffing port. He then asphyxiated over an extended period of time without any intervention by DOC staff, resulting in his death.

129.    On March 19, 2021, Javier Velasco died by suicide in his cell after correction officers failed to tour the housing unit every fifteen minutes as required. When correction officers did periodically walk up and down the area, they failed to check individual cells to verify that their residents were alive and breathing. As such, Mr. Velasco was able to tie fabric around his neck and affix it to an air vent. His body was not discovered for hours after he died.

130.    Thomas Braunson died on April 19, 2021 of a drug overdose. Over the course of the previous night and early morning, correction officers failed to remain on post and tour the

area every 30 minutes. Mr. Braunson used drugs in what should have been plain view of the DOC staff—had they been on post. When officers did tour, they failed to check each bed.

131.    In the early morning hours of August 30, 2021, Segundo Guallpa's body was discovered in his cell. At least three correction officers were present in Mr. Guallpa's unit by 9:00pm that night, but failed to tour the unit consistently, let alone every 30 minutes as required, and no officer toured the unit at all between 9:53 and 11:02 pm. At 1:11 am, DOC staff found Mr. Guallpa in his cell with a ligature made from socks wrapped around his neck and the bed frame. He was pronounced dead shortly thereafter.

132.    On September 7, 2021, Esias Johnson died of a methadone overdose. The night before his death, officers were absent from the unit for a long period of time, with an officer entering the area once at 2:59 am. Officers did not conduct rounds every 15 minutes to ensure incarcerated individuals were alive and breathing, as required. Only at 9:11 am did an officer discover that Mr. Johnson was nonresponsive, and he was pronounced dead shortly thereafter.

133.    Anthony Scott died shortly after attempting suicide on October 14, 2021. Officers in his housing unit on that day failed to tour the area as required. Mr. Scott attempted suicide while in a holding pen directly across from a correction officer's desk, while the officer's back was turned.

134.    Jose Mejia died on June 10, 2021. He was plainly experiencing a health crisis, struggling to move and stand upright for at least forty minutes within view of correction officers who did nothing to intervene. DOC staff acknowledged that the doors in Mr. Mejia's cell unit did not lock—the issue went unaddressed prior to his death.

135.    The City's widespread practice of inadequate supervision of incarcerated individuals and rounding persists to this day, even after Mr. Brown's death.

136.    In an October 28, 2022 Status Report, the Independent Monitor highlighted that "many of" the deaths in custody over the previous years "were at least partly attributable to poor security practices," including "inadequate touring by staff, ineffective searching, failures in securing doors," "staff mismanagement," and "potential staff inaction."

137.    On February 27, 2022, Tarz Youngblood died after the cell he was incarcerated in had not been checked for hours prior to his death. The Independent Monitor highlighted in the October 28, 2022 Status Report that Mr. Youngblood's death was one of many that year that was "at least partly attributable to poor security practices," including "inadequate touring by staff," "failures in ensuring the removal of sight obstructions, such as cell window coverings," and broad "operational deficiencies."

138.    In an April 3, 2023 Status Report, the Independent Monitor highlighted that its compliance unit had" conducted nearly 100 security audits of the jails since December 2021, "a majority of which [] identified staff being off post, unsecured or manipulated cell door locking mechanisms, failure to conduct timely tours of the housing units, poorly managed lock-ins, and people in custody in unauthorized areas and crowded in vestibules."

139.    And most recently, the Independent Monitor's November 22, 2024 Status Report observed that the management of the jail's housing units continues to "be fraught with security problems that create a significant risk of harm."

140.    The Independent Monitor highlighted a "large[] problem . . . of staffs' marginal levels of competency and poor performance directly related to harm"—problems that "are omnipresent."

141.    More specifically, the Independent Monitor emphasized that, to this day, "officers and Captains do not tour the units as often as required and . . . their tours are often not

meaningful (e.g., they do not look into the cell door windows to verify the safety of the individual)," which "contribute[s] to the units' overall state of dysfunction" and is "a contributing factor to several deaths in custody."

142.    After Mr. Brown's death, individuals have continued to die at alarming rates at Rikers Island due to DOC staff's widespread and persistent practice of failing to adequately monitor or supervise housing areas and care for individuals in their custody.

143.    DOC staff's failure to follow basic policies, such as remaining on post and conducting required rounds—and the City's deliberate indifference to these failures—has had predictably deadly outcomes for those incarcerated in DOC correctional facilities, including Mr. Brown.

***The City's Widespread and Persistent Practice of Failing to Provide Emergency First Aid to Incarcerated People***

144.    In the case of an emergency requiring CPR or first aid, formal DOC policy requires correction officers to render such aid until the arrival of medical personnel.

145.    Formal DOC policy instructs DOC staff members trained in CPR and currently certified in CPR administration to administer CPR.

146.    Formal DOC policy states that DOC personnel who are not CPR-certified shall limit their resuscitation efforts to rescue breathing.

147.    DOC's Correction Academy teaches DOC staff how to perform CPR and first aid and how to use automated external defibrillators.

148.    In practice, DOC staff, including correction officers, do not follow formal policies and training when responding to incarcerated people's serious medical needs.

149.    At the time of Mr. Brown's death in December 2021, the widespread and persistent practice among DOC staff, including correction officers, was to *not* provide CPR or

first aid in response to the serious medical needs of incarcerated people, including medical emergencies.

150.    Indeed, in the year leading up to Mr. Brown's death in December 2021, there was a sharp increase in in-custody death at Rikers Island. This included four individuals who died in 2021 before Mr. Brown's death. The BOC determined that DOC staff's failure to provide adequate emergency assistance contributed to each of these deaths.

151.    According to data gathered and maintained by the DOC, the DOC's in-custody mortality rate sharply increased during the years leading up to Mr. Brown's death at the end of 2021.

152.    The City's own data show that the DOC's in-custody mortality rate was 0.65 in 2017, 0.96 in 2018, and 0.41 in 2019.

153.    Then, there was a sharp increase in in-custody death in 2020, when the mortality rate increased to 2.42. That number increased yet again in 2021 to 2.87—the highest in over a decade.

154.    The Independent Monitor's October 28, 2022 Special Report expressed "grave[] concern[]" at the "alarming number of in-custody deaths" at Rikers Island, highlighting the increased death rates in 2020 and 2021. The Independent Monitor credited this "sharp increase in deaths" to "practice failures" including DOC's "poor security practices," "staff mismanagement," "operational deficiencies," and "potential staff inaction."

155.    The DOC's widespread and persistent practice of failing to provide emergency aid or CPR, and its deliberate indifference towards the same, had predictably deadly consequences for people incarcerated at DOC correctional facilities.

156.    On June 21, 2020, Herminio Villanueva, a 60-year-old man detained at Rikers Island, had an asthma attack in his housing unit, wheezing and coughing in visible respiratory distress. Although a correction officer saw that Mr. Villanueva was in respiratory distress and that other incarcerated individuals were desperately attempting to save him by carrying him out of the housing unit, the officer did not render emergency aid. Mr. Villanueva died shortly thereafter.

157.    In 2021 alone, five incarcerated individuals, including Mr. Brown, died after DOC correction officers followed this widespread and persistent practice and failed to provide timely medical assistance or CPR, or take any action at all, in response to an incarcerated person's medical emergency, as reported in the 2022 BOC report.

158.    When Thomas Braunson, *see supra* ¶ 130, was found unresponsive on his bed by other incarcerated individuals who raised the alarm and alerted the floor officer in the housing unit, correction officers stood idly by for ten minutes—they did not perform CPR or otherwise render any aid to Mr. Braunson. Mr. Braunson had consumed a large quantity of heroin and died of a drug overdose.

159.    When Esias Johnson, *see supra* ¶ 132, was found unresponsive in his cell, multiple DOC officers stood by and did nothing. No DOC staff performed CPR or rendered emergency aid, despite DOC policies that required them to do so. Medical staff arrived and were the first to perform aid, nearly fifteen minutes after he was found.

160.    When DOC officers found Segundo Guallpa, *see supra* ¶ 131, in his cell unresponsive following a suicide attempt, they stood in Mr. Guallpa's cell and talked to each other and looked at Mr. Guallpa's body, instead of rendering aid of any kind. Mr. Guallpa was pronounced dead twenty minutes later.

161.    Officers likewise failed to render emergency aid to Tomas Carlo Camacho, *see supra* ¶ 128, when they found him unresponsive in his cell following a suicide attempt, instead waiting for medical staff to arrive. When medical staff arrived, they ascertained that Mr. Camacho had a pulse. He died at the hospital two weeks later.

162.    Even though the City has long had notice of the DOC staff's widespread and persistent practice of failing to provide appropriate emergency first aid, including CPR, to incarcerated individuals, it did nothing to improve its supervision or training of its staff regarding the provision of emergency aid.

163.    In the 2022 BOC report, the BOC explicitly recommended that the DOC "reevaluate and strengthen its . . . CPR training for staff as several officers with such training failed to intervene in multiple instances" in 2021.

164.    In a March 16, 2022 Special Report, the Independent Monitor highlighted an incident that occurred in January 2022, one month after Mr. Brown's death. There, an incarcerated individual went into medical distress in his cell. Other incarcerated individuals in his housing unit attempted to summon help. There was no officer in the housing unit to provide help, so individuals attempted to appeal to the A-station officer to summon medical assistance but grew agitated in the "almost ten minutes when there was no response from staff to attend to the medical emergency." At one point, incarcerated individuals resorted to "throwing a trash container against the A-Station window in an apparent attempt to prompt the officer to respond to the medical emergency." The incident resulted in a use of force by an emergency unit against the entire housing unit, including the use of a chemical munitions grenade against the incarcerated individuals attempting to seek help.

165.    The DOC staff's widespread and persistent failure to render emergency aid, including CPR, in accordance with DOC policy has lethal consequences for individuals incarcerated at DOC correctional facilities like Mr. Brown.

***The City's Widespread and Persistent Practice of Failing to Provide Routine Medical and Mental Health Care to the Incarcerated Population***

166.    DOC staff routinely fail to produce and escort incarcerated individuals to their routine medical and mental health appointments—which can lead to dangerous lapses in essential medication, as in Mr. Brown's case.

167.    In *Agnew v. NYC Department of Correction*, the New York Supreme Court, Bronx County, found that the DOC had failed to provide access to medical care for incarcerated New Yorkers in City jails. Petitioners in that case highlighted that staff at Rikers Island ignore requests for medical visits or otherwise refuse to escort incarcerated individuals to appointments.

168.    In 2021 alone, missed medical appointments and lack of appropriate mental health care were a factor in the deaths of at least six other individuals in custody, not including Mr. Brown, according to the 2022 BOC report.

169.    Tomas Carlo Camacho, *see supra* ¶ 128, missed 26 medical appointments between August 15, 2020 and March 2, 2021, at least 17 of which were because DOC did not produce him for his appointment.

170.    Segundo Guallpa, *see supra* ¶ 131, did not receive an initial mental health assessment. His scheduled assessments were canceled twice. He subsequently died by suicide.

171.    DOC records indicated that Esias Johnson, *see supra* ¶ 132, "refused" to be seen by the clinic on the day before he died—although it was common practice for DOC officials to note that an individual "refused" an appointment when, in reality, staff did not want to bring that individual to their appointment. In Mr. Johnson's case, other incarcerated individuals said that

Mr. Johnson was complaining about not feeling well and stating that he wished to go to the clinic.

172.    Wilson Diaz-Guzman died by suicide on January 22, 2021. He was evaluated by mental health staff on January 17, 2021, the day he arrived at Rikers Island, yet his assessment was not signed by a clinician until February 17, weeks after Mr. Diaz-Guzman's death by suicide.

173.    Javier Velasco died by suicide on March 19, 2021, two weeks after he arrived at Rikers Island. He was prematurely removed from suicide watch and died by suicide three days later.

174.    Jose Mejia, *see supra* ¶ 134, was referred to a drug treatment program, but was not enrolled in and did not participate in the program.

175.    The City's widespread and persistent practice of failing to provide routine medical services, including mental health services, to incarcerated people has disastrous consequences, including, in Mr. Brown's case, going twelve days without his essential antipsychotic medication.

**FIRST CAUSE OF ACTION**
**42 U.S.C. § 1983**
**(Against the Individual Officer Defendants)**

176.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

177.    By reason of the foregoing, and by failing to promptly summon medical treatment, and/or failing to provide emergency medical treatment, the Individual Officer Defendants acted with deliberate indifference to Mr. Brown's serious medical needs, thereby depriving him of his rights, privileges, and immunities guaranteed to every citizen of the United

States in violation of 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.

178.    The Individual Officer Defendants acted at all relevant times willfully, wantonly, maliciously, and/or with such reckless disregard of consequences as to reveal a conscious indifference to the clear risk of death or serious injury to Mr. Brown that shocks the conscience.

179.    The Individual Officer Defendants acted at all relevant times under pretense and color of state law and in their individual and official capacities and within the scope of their respective employments as officers, agents, employees, and/or contracted personnel of Defendant City. Said acts by the Individual Officer Defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers.

180.    The Individual Officer Defendants acted willfully, knowingly, and with the specific intent to deprive Mr. Brown of his constitutional rights secured by 42 U.S.C. § 1983 under the Eighth and Fourteenth Amendments to the United States Constitution.

181.    As a direct and proximate result of these violations of Mr. Brown's constitutional rights, he suffered the damages alleged herein.

## <u>SECOND CAUSE OF ACTION</u>
### 42 U.S.C. § 1983
### (Against the Defendant City of New York)

182.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

183.    At the time of Mr. Brown's DOC incarceration and death in DOC custody, Defendant City permitted, tolerated, and was deliberately indifferent to the DOC's widespread and persistent policy, custom, or practice of medical neglect, deliberate indifference, and negligence by DOC officers, agents, and employees towards the serious medical needs of

incarcerated people, including by failing to provide routine physical and mental health care, and by failing to provide adequate emergency care.

184.    At the time of Mr. Brown's DOC incarceration and death in DOC custody, Defendant City permitted, tolerated, and was deliberately indifferent to the DOC's widespread and persistent policy, custom, or practice of staff's failure to adequately monitor or supervise housing areas or conduct sufficient rounds to monitor the safety and security of the incarcerated individuals in custody. This widespread and persistent policy of insufficient supervision exacerbated the deadly effects of the DOC's policy, custom, or practice of medical neglect, deliberate indifference, and negligence by DOC officers, agents, and employees towards the serious medical needs of incarcerated people, including by failing to provide adequate emergency care.

185.    Defendant City exhibited this deliberate indifference to DOC officers' persistent practices detailed *supra* by, among other things:

a.    Failing to ensure that DOC officers, agents, and employees conduct proper supervision of incarcerated people;

b.    Failing to supervise DOC officers, agents, and employees who were responsible for treating or responding to the serious medical needs of incarcerated people;

c.    Failing to adequately address the DOC staffing crisis in 2021 and thereafter;

d.    Failing to supervise DOC officers, agents, and employees who were responsible for supervising and caring for incarcerated people in DOC custody;

e.    Failing to train DOC officers, agents, and employees to provide CPR and first aid to incarcerated people facing medical emergencies;

f.      Failing to train DOC officers, agents, and employees to provide appropriate medical care to incarcerated people with serious medical needs, including in emergency situations.

186.    The City's permitting, tolerance of, and deliberate indifference towards DOC officers, agents, and employees' (1) medical neglect, deliberate indifference, and negligence by DOC officers, agents, and employees towards the serious medical needs of incarcerated people, including by failing to provide routine physical and mental health care, and by failing to provide adequate emergency care; and (2) failure to adequately monitor or supervise housing areas or conduct sufficient rounds to monitor the safety and security of the incarcerated individuals in custody constituted a municipal and corporate policy, custom, or practice. This policy, custom or practice was a direct and proximate cause of Mr. Brown's mistreatment and death, and plaintiff's resultant damages, as alleged herein.

187.    By permitting, tolerating, and acting with deliberate indifference towards DOC officers, agents, and employees' (1) medical neglect, deliberate indifference, and negligence by DOC officers, agents, and employees towards the serious medical needs of incarcerated people, including by failing to provide routine physical and mental health care, and by failing to provide adequate emergency care; and (2) failure to adequately monitor or supervise housing areas or conduct sufficient rounds to monitor the safety and security of the incarcerated individuals in custody, the City deprived Mr. Brown of the rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

a.  Awarding compensatory damages in an amount to be determined at trial;

b.  Awarding punitive damages against the Individual Officer Defendants in an amount to be

    determined at trial;

c.  Awarding Plaintiff reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

d.  Directing such other and further relief as the Court may deem just and proper, together

    with attorneys' fees, interests, costs, and disbursements of this action.


Dated: December 10, 2024
       New York, New York

                              EMERY CELLI BRINCKERHOFF
                              ABADY WARD & MAAZEL LLP


                              */s/ Laura S. Kokotailo*
                              Katherine Rosenfeld
                              Laura S. Kokotailo

                              600 Fifth Avenue, 10th Floor
                              New York, New York 10020

                              (212) 763-5000

                              *Attorneys for Plaintiff*