UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHARLENE HOWELL AS TEMPORARY ADMINISTRATOR OF THE ESTATE OF WILLIAM BROWN,

Plaintiff,

-against-

THE CITY OF NEW YORK, CORRECTION OFFICER NIKITA HERCULES, and CORRECTION OFFICER IRWIN DE LEON,

Defendants.

**OPINION AND ORDER DENYING MOTIONS TO DISMISS**

24 Civ. 9408 (AKH)

ALVIN K. HELLERSTEIN, U.S.D.J.:

On December 10, 2024, Damien Jones, as the putative administrator of the estate of William Brown (the "Estate"), filed this suit, bringing two causes of action, pursuant to 42 U.S.C. § 1983, related to the December 14, 2021 death of William Brown while he was incarcerated on Rikers Island. On November 26, 2025, Plaintiff filed the First Amended Complaint ("FAC"), substituting Charlene Howell for Jones as Plaintiff, with Howell as the temporary administrator of Brown's estate.

Defendants the City of New York, Correction Officer Nikita Hercules, and Correction Officer Irwin De Leon (collectively "Defendants") move to dismiss the First Amended Complaint for lack of subject matter jurisdiction and failure to state a claim. Defendants contend that Jones was not the administrator of Brown's estate at the time of filing the complaint and thus Article III standing was not established. Defendants additionally argue that Plaintiff's claims are time-barred and fail to adequately allege causation. For the following reasons, the motions to dismiss are denied.

## BACKGROUND

The recitation of facts is taken from the First Amended Complaint. Brown was arrested for robbery, criminal possession of a controlled substance, and petit larceny and incarcerated on Rikers Island on November 14, 2021. FAC ¶ 28. Brown was housed in the Anna M. Kross Center beginning November 28, 2021. FAC ¶ 39. Brown remained in Department of Correction ("DOC") custody at Rikers Island for thirty days, until his death on December 14, 2021. FAC ¶ 29.

On his first day in custody, Brown underwent a mental health review, at which clinical staff noted that he had "schizoaffective disorder," a condition that may cause a person to experience psychotic symptoms. FAC ¶¶ 31–32. Brown reported that he was taking Haloperidol, an antipsychotic medication. FAC ¶ 33. Brown was not seen for a mental health evaluation for twelve days after his arrival at Rikers Island because his appointments were repeatedly canceled. FAC ¶¶ 34–35. Three appointments were canceled by Correctional Health Services, two of them because of insufficient staffing levels in the facility and the resulting safety concerns, and seven were canceled because DOC staff did not produce Brown for his appointment. FAC ¶¶ 36–37. Correspondingly, Brown was not provided with his psychiatric medication until twelve days after he arrived at Rikers Island. FAC ¶ 38.

Defendant Officer Nikita Hercules and Defendant Officer Irwin De Leon (collectively "Officer Defendants") were Correction Officers at Rikers Island. FAC ¶ 18-19, 42. Hercules had eight instances of command discipline on her record, four of which were for failure to report to her post or failure to report to work, and on November 9, 2021, Hercules was suspended for thirty days for being absent without leave on October 23, 2021. FAC ¶¶ 44–46.

DOC policy requires officers to conduct rounds of their assigned housing areas at least every 30 minutes. FAC ¶ 53. DOC policy also requires officers to render CPR or first aid in response to a medical emergency until medical personnel arrive. FAC ¶ 144. Hercules and De

Leon were the officers assigned to Brown's housing unit. On the evening of December 14, 2021, Hercules left her post at 6:58 p.m. and reported in her logbook that she was touring her assigned areas, apart from 9:00 p.m. to 9:30 p.m. when she logged being off post for personal reasons. FAC ¶¶ 51–54. Plaintiff alleges that Hercules's logbook entries were false and that Hercules was not touring the unit during those hours. FAC ¶ 56. Hercules's logbook noted she imposed an "institutional lock in" at 9:00 p.m. FAC ¶ 60. However, Plaintiff alleges that Hercules did not impose such a lock and that the incarcerated individuals in Brown's housing unit continued to move about and congregate in the building's dayroom. FAC ¶¶ 61–62.

From around 10:20 p.m. onward, Brown and other incarcerated individuals were gathered in the dayroom. FAC ¶¶ 63–65. Plaintiff alleges that De Leon's assigned post afforded a clear view of the dayroom, such that he would have observed Brown and the other individuals improperly congregating there had he been at his post. FAC ¶¶ 67, 82. At 10:26 p.m., Brown and other individuals smoked an unknown substance. FAC ¶ 66. Within minutes, Brown slumped in his chair and fell over, and other individuals began vomiting and falling to the ground. FAC ¶¶ 68–71. Plaintiff alleges that other incarcerated individuals attempted to assist Brown. FAC ¶ 72. Plaintiff alleges that at 10:32 p.m. Hercules returned to her post and observed the dayroom for five minutes before summoning medical help. FAC ¶¶ 74–84. Hercules then observed the situation for an additional five minutes before beginning to render medical aid to Brown. FAC ¶¶ 85–89. Hercules started chest compressions on Brown, attempting compressions for about a minute, stopping chest compressions for three minutes then resuming until medical staff arrived three minutes later. FAC ¶¶ 86–92. The medical staff performed chest compressions until emergency medical services arrived. FAC ¶ 93. Brown was pronounced dead at 11:46 p.m. FAC ¶ 94. The New York City Office of the Chief Medical Examiner determined the official cause of Brown's death to be acute synthetic cannabinoid intoxication. FAC ¶ 96. Plaintiff alleges that De Leon took no action to assist throughout the entire medical emergency. FAC ¶¶ 82–83. Plaintiff alleges

that a rapid response to a medical emergency, and the performance of continuous chest compressions without interruption, are critical to survival in such circumstances. FAC ¶ 90.

The New York City Board of Correction ("BOC") is the City agency that regulates, monitors, and inspects City correctional facilities, and it is required by statute to investigate the circumstances of all in-custody deaths at those facilities. FAC ¶¶ 97–98. The BOC investigated Brown's death, interviewing people in custody and DOC staff and reviewing video footage, DOC records, and medical records. FAC ¶¶ 99–100. The BOC published its report on Brown's death on September 12, 2022, as part of the Report and Recommendations on 2021 Suicides and Drug-Related Deaths in New York City Department of Correction Custody (the "BOC Report"). FAC ¶ 101. The BOC Report stated that sixteen people, including Brown, died in DOC custody in 2021—six by suicide, four by acute drug intoxication, and six from medical complications—and it reviewed ten of those deaths. FAC ¶ 102. The BOC Report found that Hercules "did not tour either the dormitory or dayroom every 30 minutes, despite making entries in the logbook stating otherwise," and instead "remained seated and mostly stationary at the 'B' Post table," until she left the post at approximately 6:10 PM, and "the post remained empty and there were no correction officers in the housing area until 10:33 PM." FAC ¶ 104.

The BOC Report also found that "the pervasive issue of insufficient rounding and supervision by correctional staff was present in at least eight of the ten deaths reviewed," and that "in the case of William Brown, a 'B' post remained empty from at least 6:10 PM to 10:33 PM. During this unsupervised period, people in custody smoked, were in the dayroom past 9:00 pm against DOC policy, and ultimately became sick. DOC failed to adequately maintain the care, custody, and control of these housing areas by not actively supervising those in their custody according to their own policies, leading to tragic results." FAC ¶ 107. The BOC Report further found that "uniformed staff failed to provide timely first aid, if at all, in at least five of the deaths described above," including Brown's, where "[t]he correction officer assigned to William Brown's

housing area stood by for at least nine minutes while multiple individuals vomited, and Mr. Brown became unresponsive, before performing chest compressions." FAC ¶ 111. The Report also found that Brown received none of his psychiatric medication until twelve days after his admission to Rikers Island because of "delays in his mental health evaluation," and it noted his many missed medical appointments, some canceled by Correctional Health Services ("CHS") because of "insufficient staffing levels in the facility and due to safety concerns," and others canceled because DOC staff failed to produce him. FAC ¶¶ 112–13.

Plaintiff alleges that the BOC Report made similar findings as to seven other people who died in DOC custody in 2021 before Brown—Thomas Carlo Camacho, Javier Velasco, Thomas Braunson, Segundo Guallpa, Esias Johnson, Anthony Scott, and Jose Mejia—concluding as to each that "DOC failed to adequately maintain the care, custody, and control of [DOC] housing areas by not actively supervising those in their custody according to their own policies, leading to tragic results." FAC ¶¶ 126–27. Camacho, Velasco, Guallpa, and Scott died by suicide or following suicide attempts; Braunson and Johnson died of drug overdoses; and Mejia died after visibly struggling to move and stand upright for at least forty minutes within view of correction officers who did not intervene. FAC ¶¶ 128–34. Plaintiff further alleges that the Report found that DOC staff failed to render timely emergency aid in four of those deaths, FAC ¶¶ 158–61, and that missed medical appointments and inadequate mental health care were a factor in the deaths of at least six other people in DOC custody in 2021. FAC ¶ 168.

Plaintiff also relies on the reports of the independent monitor appointed by a judge of this Court to oversee the City's compliance with the consent judgment in *Nunez v. City of New York*, which concerns conditions of confinement at Rikers Island (the "Independent Monitor"). FAC ¶ 117. In the summer of 2021, months before Brown's death, the Independent Monitor described a "staffing crisis" at Rikers Island arising from widespread failures of DOC staff to report to work. FAC ¶¶ 117–22. In an October 28, 2022 status report, the Independent Monitor

stated that "many of" the deaths in custody in the preceding years "were at least partly attributable to poor security practices," including "inadequate touring by staff, ineffective searching, failures in securing doors," "staff mismanagement," and "potential staff inaction." FAC ¶ 136.

Plaintiff alleges that Tarz Youngblood died on February 27, 2022, roughly two months after Brown, after the cell in which he was incarcerated went unchecked for hours, and that the Independent Monitor identified his death as one of those attributable to poor security practices, including "inadequate touring by staff." FAC ¶ 137. In an April 3, 2023 status report, the Independent Monitor stated that a majority of the nearly 100 security audits its compliance unit had conducted since December 2021 "identified staff being off post, . . . failure to conduct timely tours of the housing units, poorly managed lock-ins, and people in custody in unauthorized areas." FAC ¶ 138. In a November 22, 2024 status report, the Independent Monitor observed that the management of the jails' housing units continues to "be fraught with security problems that create a significant risk of harm," and that "officers and Captains do not tour the units as often as required." FAC ¶¶ 139–41.

Plaintiff alleges that the City had notice of widespread and persistent practices of insufficient supervision by staff, of staff failing to provide emergency first aid to incarcerated people, and of failing to provide routine medical and mental health care. FAC ¶¶ 183–84. Plaintiff separately alleges that the City, having been placed on notice of those practices, permitted and tolerated them and was deliberately indifferent to them, including by failing to address the DOC staffing crisis in 2021 and thereafter and by failing to train and supervise DOC staff in the supervision of, and the provision of emergency aid to, incarcerated people. FAC ¶ 185. Plaintiff brings 42 U.S.C. § 1983 claims against the Officer Defendants for violations of the Eighth and Fourteenth Amendments for deliberate indifference to Brown's serious medical needs. Plaintiff brings a claim under 42 U.S.C. § 1983 against the City, alleging violations of the Eighth and

Fourteenth Amendments for the City's deliberate indifference to the widespread and persistent practices noted above.

On December 2, 2024, Jones filed a petition for Letters of Administration for Brown's Estate, stating that he was Brown's half-brother. Jones filed this suit on December 10, 2024. His petition remained pending in Surrogate's Court for several months, with the court asking for additional information from Jones in April 2025. On April 9, 2025, the City moved to dismiss the original complaint, arguing that Jones lacked standing and Plaintiff failed to state a claim. ECF No. 14. I denied the motion without prejudice. ECF No. 21.

On October 7, 2025, Jones withdrew his petition without being appointed administrator or temporary administrator. On October 17, 2025, Howell filed a petition to be temporary administrator and administrator of Brown's estate. Howell was appointed as temporary administrator on October 31, 2025. On November 25, 2025, I granted Plaintiff's request to substitute Howell as plaintiff and to file the First Amended Complaint. Defendants now move to dismiss arguing that I lack subject matter jurisdiction over the matter because Jones did not have standing to bring the original suit. The Officer Defendants join the City's motion except as to the branch addressed to the claim for municipal liability. ECF No. 49.

## LEGAL STANDARD

On a motion to dismiss under Rule 12(b)(1), the plaintiff bears the burden of alleging facts to demonstrate each element of standing. *Warth v. Seldin*, 422 U.S. 490, 517–18 (1975). A plaintiff must allege the standing requirements "with the manner and degree of evidence required at the successive stages of the litigation" such that "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support a claim." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "For purposes of ruling on a

motion to dismiss for want of standing, [the trial court] must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth*, 422 U.S. at 501. However, the Court "need not credit a complaint's conclusory statements without reference to its factual context." *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 172 (2d Cir. 2021). For a Rule 12(b)(1) motion, the court may refer to evidence outside of the pleadings "where jurisdictional facts are placed in dispute." *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 441 (2d Cir. 2022). Where jurisdictional facts are challenged by extrinsic evidence, the plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence, and no presumptive truthfulness attaches to the pleadings. *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). The jurisdictional facts material here are undisputed: Jones was never appointed administrator or temporary administrator of Brown's estate, and Howell was appointed temporary administrator on October 31, 2025.

On a Rule 12(b)(6) motion to dismiss, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Freidus v. Barclays Bank PLC*, 734 F.3d 132, 137 (2d Cir. 2013). To survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "'[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief,' . . . or where a plaintiff has 'not nudged [its] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed[.]'" *Durr v. Slator*, 558 F. Supp. 3d 1, 15 (N.D.N.Y. 2021) (quoting *Twombly*, 550 U.S. at 558, 570).

## DISCUSSION

Defendants argue that the Court lacks subject matter jurisdiction over the case because Jones lacked standing to file this action, that Howell's claims are time-barred, and that Plaintiff fails to state a claim. For the following reasons, each argument fails and the motions are denied.

### I. The Court has subject matter jurisdiction and Plaintiff has standing.

Defendants argue that Plaintiff lacks standing because Jones, who first filed the case, was not appointed administrator of Brown's estate. The "'irreducible constitutional minimum' of standing consists of three elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan*, 504 U.S. at 560. "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338 (citing *Lujan*, 504 U.S. at 560–61). To establish an injury in fact, a plaintiff "must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560).

Defendants contend that Jones lacked standing to bring the case because he was not the administrator of the Estate. "Defendants equate Plaintiff's lack of capacity with a lack of standing … [h]owever … '[l]ack of capacity is generally not considered jurisdictional.'" *Purcell ex rel. Estate of Tyree v. City of New York*, 2020 WL 2559796, at *6 (E.D.N.Y. May 19, 2020) (quoting *Fletcher v. City of New London*, No. 16-CV-241 (MPS), 2017 WL 690533, at *3 (D. Conn. Feb. 21, 2017)). The administrator of an estate is merely a vessel to assert the claims of the real party in interest, the estate itself. A personal representative of an estate "sues not to obtain a remedy for an injury done to him or her personally," rather "a personal representative sues on

behalf of an estate." *Purcell*, 2020 WL 2559796, at *7. When Jones filed the case, he did so on behalf of Brown's estate. Thus, the question of standing is based on whether the Estate satisfies the standing requirements, which it does. The Estate suffered an injury in fact: the deprivation of Brown's constitutional rights, culminating in his death in DOC custody. That injury is fairly traceable to the conduct alleged against the Officer Defendants and, through *Monell*, against the City. And it is redressable by an award of damages to the Estate. *See Lujan*, 504 U.S. at 560–61.

Defendants' argument also confuses the requirements of standing with the real party in interest doctrine, which "ensures that only a person who possesses the right to enforce a claim and who has a significant interest in the litigation can bring the claim." *Purcell*, 2020 WL 2559796, at *5. Federal Rule of Civil Procedure 17 allows for executors or administrators to "sue in their own names without joining the person for whose benefit the action is brought." Fed. R. Civ. P. 17(a)(1)(A–B). A "court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." Fed. R. Civ. P. 17(a)(3).

However, "Rule 17(a) substitution of plaintiffs should be liberally allowed when the change is merely formal and in no way alters the original complaint's factual allegations as to the events or the participants." *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 20 (2d Cir. 1997). The Court retains "some discretion to dismiss an action where there was no semblance of any reasonable basis for the naming of an incorrect party," *id.*, and on a motion under Rule 12(b)(1) may consider the Surrogate's Court records Defendants have submitted. Those records show that Jones petitioned for letters of administration eight days before this action was filed, that he was never appointed, and that he withdrew his petition after he proved unable to establish his relationship to Brown. They do not show that there was no semblance of a reasonable

basis for naming him. Jones's petition was pending when suit was filed, and, as I observed in denying the first motion to dismiss, either he or another would be appointed to represent Brown's estate. ECF No. 21. When it became clear that Jones would not be, counsel obtained the appointment of Howell, who could establish her relationship to Brown, and promptly moved to substitute. Therefore, Howell was properly substituted into this action after she was appointed temporary administrator of the Estate. As temporary administrator, Howell is a real party in interest to the case and is the proper party to bring the Estate's claims.

Defendants' contrary authority does not compel a different result. They rely principally on *Cortlandt Street Recovery Corp. v. Hellas Telecommunications, S.à.r.l.*, 790 F.3d 411 (2d Cir. 2015), for the proposition that an action filed by a plaintiff without standing is a nullity into which no real party in interest may later be substituted. However, the facts of *Cortlandt* do not support extending that principle here. In *Cortlandt*, the plaintiff lacked standing because the claims were improperly assigned to it and the district court denied substitution under Rule 17(a)(3) to allow the party who held the claim to be substituted in. Here the injured party, the Estate, has been the party on whose behalf this action was prosecuted since the day it was filed. Defendants' remaining authorities fail for the same reason. *See Disability Advocates, Inc. v. N.Y. Coalition for Quality Assisted Living, Inc.*, 675 F.3d 149, 156–60 (2d Cir. 2012) (organizational plaintiff itself lacked standing to assert the claims pleaded).

**II. Plaintiff's claims are timely.**

Defendants argue in the alternative that Howell's claims are time-barred because she was not appointed temporary administrator, and did not appear in this action, until after the limitations period had run. Section 1983 applies the forum State's statute of limitations for personal injury actions, which in New York is three years. N.Y. C.P.L.R. § 214(5); *Owens v. Okure*,

488 U.S. 235, 249–51 (1989). Brown died on December 14, 2021, and the original complaint was filed on December 10, 2024—four days before the period expired. The question is therefore whether the First Amended Complaint, filed November 26, 2025, relates back to that filing. I hold that it does. Under Rule 17 substitution, "the action proceeds as if it had been originally commenced by the real party in interest." Fed. R. Civ. P. 17(a)(3). Such substitution allows for the claim to relate back to the original filing of the complaint. *Brohan ex rel. Brohan v. Volkswagen Mfg. Corp. of Am.*, 97 F.R.D. 46, 49 (E.D.N.Y. 1983).

Even if Rule 17(a)(3) did not supply relation back, Rule 15 would. An amendment relates back when it "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out . . . in the original pleading," Fed. R. Civ. P. 15(c)(1)(B), and the central inquiry is whether the original pleading gave the opposing party adequate notice, within the limitations period, of the matters raised in the amendment. *Slayton v. American Express Co.*, 460 F.3d 215, 228 (2d Cir. 2006). The First Amended Complaint did not alter the substance of the pleadings. Defendants had notice of every allegation against them well within the limitations period, and they identify no prejudice. Therefore, the claims relate back under Rule 15 as well.

**III. Plaintiff states a claim under *Monell*.**

The City renews the argument, which I rejected without prejudice on its earlier motion, that Plaintiff fails to state a claim for municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). The Officer Defendants do not join this branch of the motion. ECF No. 49. Under *Monell*, "[m]unicipalities may be sued directly under section 1983 for constitutional deprivations imposed upon the plaintiff pursuant to a governmental custom, policy, or usage of the municipality." *Greene v. City of New York*, No. 08-CV-243, 2017 WL 1030707, at *29 (E.D.N.Y. Mar. 15, 2017) (citation omitted). To succeed on a claim for municipal liability, a plaintiff must prove "(1) an official policy or custom that (2) causes the plaintiff to be subjected

to (3) a denial of a constitutional right." *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995). Plaintiff meets this standard.

A municipality may not be held liable under § 1983 absent an underlying violation of the plaintiff's constitutional rights by a municipal actor. *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006). That predicate is adequately pleaded. Brown was a pretrial detainee, so his claim of deliberate indifference to serious medical needs arises under the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment, and is governed by *Darnell v. Pineiro*, 849 F.3d 17, 29, 35 (2d Cir. 2017). The First Amended Complaint invokes both Amendments, FAC ¶¶ 177, 180, 187, but pleads jurisdiction under the Fourteenth. FAC ¶¶ 21–22. I treat the claims as arising under the Fourteenth Amendment. Plaintiff alleges that Hercules abandoned her post for more than three hours in violation of DOC policy and falsified her logbook to conceal it, and that on returning she watched Brown lie unresponsive on the dayroom floor for at least nine minutes before beginning chest compressions, which she then interrupted for three minutes, and that De Leon, whose post afforded a clear view of the dayroom, did not render aid. FAC ¶¶ 51–56, 74–89. Those allegations plausibly plead a violation of Brown's Fourteenth Amendment rights.

**A. Plaintiff adequately pleads a lack of supervision custom.**

Plaintiff alleges that the City maintained three widespread and persistent practices: insufficient supervision of incarcerated individuals by DOC staff, failure to provide emergency first aid to incarcerated individuals, and failure to provide routine medical and mental health care to incarcerated individuals. Allegations of widespread and persistent practices may be pled by allegations of a de facto policy. "To demonstrate a *de facto* policy or custom through a widespread practice, a plaintiff must show that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." *Rodriguez v. City of New York*, 607 F. Supp. 3d 285, 292 (E.D.N.Y. 2022) (citations omitted). Additionally,

municipal liability can be established "based on a showing of 'deliberate indifference' to a recurring situation likely to result in a constitutional violation." *Id.* "In such circumstances, the policy or custom requirement is satisfied 'where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions.'" *Id.* at 292–93 (citation omitted).

The City disputes the existence of the supervision custom, arguing that the incidents Plaintiff alleges are too few and too dissimilar to establish a custom. The City does not dispute, at this stage, the other two customs. "A plaintiff may adequately plead the existence of de facto customs or policies based on governmental reports documenting constitutional deficiencies or misconduct if such reports are sufficiently connected to the specific facts of the case." *Id.* at 292. Here, Plaintiff has met that standard. The BOC Report, reviewing ten deaths occurring in 2021, found that "the pervasive issue of insufficient rounding and supervision by correctional staff was present in at least eight of the ten deaths reviewed," including Brown's, and that in those deaths "DOC failed to adequately maintain the care, custody, and control of [its] housing areas by not actively supervising those in their custody according to their own policies." FAC ¶¶ 97–99, 107, 127. Seven of those deaths preceded Brown's. FAC ¶¶ 128–34. The *Nunez* monitor described the same failures in the summer of 2021, months before Brown died. FAC ¶ 117. Those reports, including one from the City's own oversight agency and one from a monitor appointed by a judge of this Court, suffice at the pleading stage to allege that the City's policymakers were aware of the practice and consciously chose not to correct it. *Rodriguez*, 607 F. Supp. 3d at 292.

The cases the City cites requiring more were decided on a trial record and on summary judgment, respectively, not on the pleadings. *See Jones v. Town of E. Haven*, 691 F.3d 72, 85 (2d Cir. 2012) (three incidents, on a trial record, "fell far short of showing a policy, custom, or usage"); *Giaccio v. City of New York*, 308 F. App'x 470, 472 (2d Cir. 2009) (summary order) (four incidents, on summary judgment). Regardless, the number of prior incidents is not itself the

test. What matters is whether the practice is "so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). The BOC Report itself identifies the practice that led to eight deaths. This is sufficient to support the pleadings at this stage. The City's remaining objections misidentify the custom alleged. That Camacho, Velasco, Guallpa, and Scott died by suicide rather than by intoxication does not distinguish them because the practice alleged is leaving housing areas unsupervised, which the BOC found contributed to each of those deaths. FAC ¶¶ 128–34. Nor does it matter that Youngblood died in February 2022 and that *Nunez* status reports postdate Brown's death. Those allegations show that the City, having been placed on notice, left the practice in place, which is the deliberate indifference the FAC separately alleges. FAC ¶¶ 138–41, 185.

**B. Plaintiff adequately pleads causation.**

To establish municipal liability under § 1983 the Court must also address "whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). The policy or custom must be the "moving force" behind the constitutional violation. *Monell*, 436 U.S. at 694. A policy is a proximate cause of an injury "if the injury is within the scope of the original risk and therefore foreseeable." *Bishop v. City of New York*, 2016 WL 4484245, at *5 (S.D.N.Y. Aug. 18, 2016) (citation omitted). At the pleading stage, however, Plaintiff need not prove causation. Rather, she need only allege facts that "plausibly suggest . . . a causal link between" the challenged practices and the constitutional injury. *Buari v. City of New York*, 530 F. Supp. 3d 356, 400 (S.D.N.Y. 2021).

Plaintiff has done so here. The findings of the BOC tie each of the three alleged practices to Brown's death. As to supervision, the BOC found that the "pervasive issue of insufficient rounding and supervision by correctional staff was present in at least eight of the ten deaths reviewed," including Brown's, and that during the more than three and a half hours in which

Hercules's post sat empty, incarcerated individuals smoked, remained in the dayroom past the 9:00 p.m. lock-in in violation of DOC policy, and became sick. FAC ¶ 107. As to emergency aid, the BOC found that uniformed staff failed to render timely first aid in at least five of the deaths it reviewed, including Brown's, where the officer assigned to his housing area "stood by for at least nine minutes while multiple individuals vomited, and Brown became unresponsive, before performing chest compressions." FAC ¶ 111. Plaintiff further alleges that a rapid response and continuous chest compressions are critical lifesaving measures, and that DOC's own policies require officers to render aid until medical personnel arrive. FAC ¶¶ 90, 144. As to routine medical and mental health care, the BOC found that Brown received none of his psychiatric medication until twelve days after his admission, owing to delays in his mental health evaluation and to appointments canceled both by CHS and by DOC's failure to produce him. FAC ¶¶ 112–13.

The City's arguments to the contrary are unavailing. The City first contends that the officers' delay in rendering aid cannot have caused Brown's death because the Medical Examiner attributed that death to acute synthetic cannabinoid intoxication. But the medical cause of death is not the same thing as the absence of an opportunity to prevent it. Drawing all reasonable inferences in Plaintiff's favor, the allegations that officers watched Brown lie unresponsive on the floor for at least nine minutes, and that the chest compressions eventually begun were interrupted for three minutes, permit the inference that a prompt response consistent with DOC's own policy would have changed the outcome. Whether it in fact would have is a question for discovery and, if necessary, trial.

The City also contends that the failure to provide routine medical and mental health care did not cause Brown to smoke a synthetic cannabinoid, noting that Brown received his medication 18 days before he died. I disagree. It is reasonably foreseeable that a man diagnosed with schizoaffective disorder, deprived of his antipsychotic medication for twelve of his thirty days

in custody, would decompensate and turn to intoxicants. FAC ¶¶ 31–38. That is precisely the risk that routine mental health care exists to guard against, and Brown's death accordingly falls "within the scope of the original risk." *Bishop*, 2016 WL 4484245, at *5. Whether the lapse in medication in fact contributed to Brown's conduct on December 14, 2021 is a factual question that cannot be resolved on the pleadings.

**CONCLUSION**

For the foregoing reasons, Defendants' motions to dismiss are denied. The Court has subject matter jurisdiction over the case, Plaintiff's claims are timely, and Plaintiff has stated a claim for municipal liability against the City. The parties shall appear a status conference on October 16, 2026 at 10 a.m. The Clerk of Court shall terminate ECF Nos. 44 and 49.

SO ORDERED.

Dated: August 17, 2026
New York, New York

ALVIN K. HELLERSTEIN
United States District Judge